FILED
13th JUDICIAL DISTRICT COURT
Sandoval County
10/7/2020 9:58 AM
AUDREY GARCIA
CLERK OF THE COURT
MaryAnn Lowe

STATE OF NEW MEXICO
SANDOVAL COUNTY
THIRTEENTH JUDICIAL DISTRICT COURT

JOE MICELI,

Plaintiff,

v. case no. D-1329-CV-2020-01597

SOUTHWIND MANAGEMENT CORP.,
SPINNAKER RESORTS INC. and Jane Does 1-10,

Defendants.

**COMPLAINT FOR VIOLATIONS OF THE UNFAIR PRACTICES ACT, THE TELEPHONE CONSUMER PROTECTION ACT AND TORTS**

TO THE HONORABLE COURT:

1. Plaintiff Joe Miceli ("Plaintiff") is a real person who may be contacted through his undersigned attorney.

2. Plaintiff brings this action in accordance with New Mexico state-law and the anti-harrassment provisions of the Telephone Consumer Protection Act ("the TCPA"), a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

3. The TCPA and the FTC's Telemarketing Sales Rule ("the TSR") established the National Do-Not-Call Registry ("the Registry"). The Registry allows people to list their telephone numbers

EXHIBIT A

and thereby indicate their instructions to NOT receive telephone solicitations. *See* www.donotcall.gov

4. Telemarketers are required by law to subscribe to and comply with the Registry. NMSA § 57-12-22(C); 47 U.S.C. § 227(C)(3)(F-G); 16 C.F.R. Part 310; 47 C.F.R. § 64.1200(c).

5. "[U]nwanted robocalls and texts, both telemarketing and informational, top the list of consumer complaints received by" the FCC. *See Omnibus TCPA Order*, GC Docket 02-278, FCC 15-72, 2015 WL 4387780 ¶1 (July 10, 2015).1

6. "39 percent of adults were wireless-only in the second half of 2013[.]" *Id.* at paragraph 7. Nearly 50% of all calls to cell phones are now robocalls.2

7. The New Mexico Unfair Practices Act ("the UPA") and the TCPA each established private rights of action to receive statutory damages for unlawful robocalling and for violations of the Registry's implementing regulations.

**Venue and Jurisdiction**

8. Plaintiff and his telephone were in the State of New Mexico at the time of the illegal telemarketing the subject of this Complaint that Defendants and/or their agents harassed him with. Plaintiff resides in Sandoval County. Venue is proper and the Court has subject matter jurisdiction.

9. Defendants do business within New Mexico because Defendants or their agents regularly, automatically, repeatedly telephone the phones of New Mexicans located within New Mexico for

---

1. The FCC defines "robocalls" as "calls that require consumer consent" including "calls made either with an [autodialer] or with a prerecorded or artificial voice". *Rules Implementing the TCPA*, CG Docket No. 02-278, Declaratory Ruling and Order released on 7/10/15, 30 FCC Rcd. 7961, fn 1.

2. Senate Committee (US) on Commerce, Science and Transportation, Report 116-41 issued on 5/21/19 for the Telephone Robocall Abuse Criminal Enforcement and Deterrence Act, page 2 with citations.

the purpose of advertising products and services. Defendants authorized and approved telemarketing to sell products and services throughout the State of New Mexico. By directing telemarketing phone calls into the forum state, Defendants made themselves subject to the specific personal jurisdiction of the courts of the forum state.

**the Defendants and their Unlawful Telemarketing conspiracy**

10. Defendant Southwind Management Corp. ("Southwind" or "Defendants") is a company that should be served a Summons by service on its officer Basil Matthews or its officer Carolyn Oliver ("Oliver") at 35 DeAllyon Ave., Hilton Head, SC 29928.

11. Defendant Spinnaker Resorts Inc. ("Spinnaker" or "Defendants") is a Florida corporation that should be served a Summons by service on its officer Basil Matthews or its officer Carolyn Oliver at 35 DeAllyon Ave., Hilton Head, SC 29928.

12. Defendants Jane Does 1-5 ("Jane Does" or "Defendants") are real persons or entities who substantially directed, operated, controlled and/or participated with the other Defendants named above in the telemarketing conspiracy described in this Complaint that harassed Plaintiff, including the call-center proprietors and operators who actually initiated the calls at issue to Plaintiff. Their identities and whereabouts will be discovered so that process can be duly served on them.

13. Attached hereto (pages numbered 1, 2 and 3) in support of this Complaint is a sworn statement of Defendants' officer Basil Matthews ("Matthews") describing their operations.

14. Spinnaker is a real estate company that owns and sells time-share interests and properties.

15. Spinnaker contracts with its wholly-owned subsidiary corporations for those entities to engage in telemarketing on behalf of Spinnaker to sell its time-share products, services and interests.

16. Spinnaker has no employees and is thus completely controlled and dominated by Southwind, Matthews and Southwind's other principals, managers and officers including Oliver, Oliver's father Ken Taylor ("Ken"), Ken Taylor's son Brian Taylor ("Brian") and Brian's wife Joan Taylor.

17. Southwind and its principals, managers and officers have actual or constructive knowledge of all Spinnaker's acts and omissions, of all Spinnaker's subsidiaries acts and omissions and in fact Southwind and its principals, managers and officers direct all those acts and omissions.

18. At the direction and under the control of Southwind and Spinnaker or with their knowledge, approval and ratification, Spinnaker's wholly-owned subsidiary corporations outsource telemarketing including the robocalling that harassed Plaintiff as described below, to market for Southwind and Spinnaker as Sellers and sponsors of the calls.

19. Southwind's and Spinnaker's principals, managers and officers have formed a complex amalgamation of legal entities, including Spinnaker's wholly-owned subsidiaries, which blur the legal distinctions between the entities and their activities. This amalgamation of entities was formed, maintained and is used to perpetrate unfair trade practices and other wrongful conduct such as the unlawful telemarketing the subject of this Complaint.

20. If Southwind, Spinnaker or their principals, managers and officers do not have actual knowledge that Jane Does on their behalf use robocalling to generate their sales leads, they choose to remain willfully or consciously ignorant of whether or not Jane Does are complying with the Registry and prohibitions against the use of automated dialing.

21. Defendants facilitate, condone and rely on the robocalling because they are personally enriched by and profit from the same.

22. Minimal oversight by Defendants would confirm for them that their agents the Jane Does do not comply with the Registry, the UPA, the TCPA or the TSR.

23. Defendants do not subscribe to or comply with the Registry.

24. Defendants have not adopted or implemented policies or practices to comply with the TSR.

25. Defendants do not train or supervise their Jane Does for telemarketing compliance.

26. Mass-marketing by robocall results in consumer complaints. Based on the numbers of consumer complaints to and about their telemarketers Jane Does, Defendants had an actual awareness or should have had an actual awareness that their agents actually making or initiating the robocalls, including the calls to Plaintiff described below, used robocalls directed to people who objected to the calls, to cell phones, to people who did not consent to them, and to people whose telephone numbers were listed on the Registry.

27. Defendants also knew, should have known or were recklessly or consciously indifferent to the fact that their agents used robocalls directed to people who objected to the calls, to cell phones, to people who did not consent to them, and to people whose telephone numbers were listed on the Registry, because they gained knowledge of the marketing methods used by Jane Does on their behalf in their follow-up sales efforts with people who expressed interest or responded positively. Consumers describe to salespeople how they came to be referred to the salespeople.

28. Defendants gave and continue to give substantial assistance or support to Jane Does and each other while knowing, consciously avoiding knowing or being recklessly indifferent to the fact

that they are all engaged in acts or practices that violate the UPA, TCPA and the FTC's Telemarketing Sales Rule ("the TSR").

**The Illegal Phone Calls to Plaintiff Defendants are Responsible For**

29. Plaintiff's telephone is a wireless or cell phone assigned the number **505-506-1511**.

30. Defendants or their agents Jane Does have repeatedly called Plaintiff's wireless phone with an automatic telephone dialing system ("auto-dialer") using a device that caused Plaintiff's Caller ID to display New Mexico area code phone numbers.

31. The New Mexico area code phone numbers Defendants or their agents Jane Does caused Plaintiff's Caller ID to display, are not working or valid phone numbers at which the callers can be called back, and the Caller ID on the calls did not display the name of the caller, Seller or sponsor of the calls.

32. The fake New Mexico Caller ID display was used to mislead and deceive Plaintiff into a belief the caller might actually be a local caller, so that Plaintiff would be more likely to answer. The calls were made to Plaintiff from outside the State of New Mexico.

33. Plaintiff states Defendants' calls to Plaintiff referred to above were made or initiated with an autodialer because when he answered the calls he was greeted by an artificial voice or pre-recorded message. The use of artificial or pre-recorded voices to greet consumers who answer phone calls, is a tell-tale indicator of mass-marketing by automation as opposed to manual or human-made calls. If a real person were manually dialing phone numbers, this actual human being would not just play a recording to consumers who answer the calls.

34. The pre-recorded message that greeted Plaintiff when he answered Defendants' calls never gave Plaintiff any accurate identification or location information for any of the Defendants as

required by law. The message lied to Plaintiff, telling him it was from a major hotel chain such as "Ritz Carlton", "Marriott" or "Wyndham" and that Plaintiff's phone number had been "pre-selected to receive a complimentary stay".

35. Defendants' artificial or pre-recorded voice message gave Plaintiff an option to press "1" to speak to a live person, which Plaintiff did solely for the purpose of attempting to identify Defendants.

36. When the live telemarketer came on the line Plaintiff patiently listened to the sales pitch and expressed interest so he would be called back later by another telemarketer who would identify the Defendants.

37. All the calls to Plaintiff described above, from Defendant or its agents, were over 15 seconds long but no accurate identification or location information for Defendants or the actual callers was ever given to Plaintiff during any of the phone calls or phone conversations described above.

38. Another telemarketer did call Plaintiff back, who said his name was "Nick". "Nick" referred to the previous calls as the reason he called Plaintiff.

39. Plaintiff patiently listened to Nick's scripted sales pitch about a vacation package that would be for a "4 day and 3 night stay", for "$369 plus tax". After a few minutes another telemarketer came on the line who said her name was "Carmen". "Carmen" continued the scripted sales pitch with Plaintiff.

40. Carmen began promising Plaintiff even more than Nick promised. Carmen said "we are including a second vacation at no additional cost to you" of up to "7 days and 6 nights". She also reduced the price to $299 plus tax.

41. To accurately identify the Defendants Plaintiff purchased the product or services offered by Defendants' telemarketers Nick and Carmen, except he negotiated the price down to a "deposit" of $100.

42. During the conversation with "Carmen", Defendants charged his credit card the $100 deposit Plaintiff negotiated with Carmen.

43. Carmen stated she could be called back at 877-301-7829. That is a legitimate customer service phone number controlled by Defendants.

44. The merchant information given to Plaintiff's credit card payment processor for the $100 charge Defendants took included the phone number 866-455-3577. That is a legitimate customer service phone number controlled by Defendants.

45. Carmen and Nick knowingly made false and misleading representations to Plaintiff about what he would receive for his purchase. Their false and misleading representations were of the type that may, tend to or do deceive or mislead credulous or gullible consumers.

46. Defendants know, intend and ratify that their telephone salespeople make false and misleading representations that may, tend to or do deceive or mislead credulous or gullible consumers, because Defendants train and supervise their telephone salespeople. Defendants have numerous recordings of these telephone conversations where lies are told to consumers, and Defendants listen to these recordings. Defendants are required by law to make and have these recordings. 16 CFR § 310.4(a)7

47. Defendants will not give Plaintiff a "4 day and 3 night" vacation package plus another vacation of "7 days and 6 nights" with no strings attached as represented in the phone conversations described above, for the price promised by Defendants' telemarketers.

48.   Carmen asked Plaintiff for his email address and other contact information so she could send Plaintiff a "confirmation package" about the vacations he purchased.

49.   One of the names Plaintiff gave "Carmen" to use in connection with the "confirmation package" Carmen said would be sent, was: "Mary Miceli".

50.   Less than an hour after the transaction described above, Defendants sent Plaintiff an email with an attached letter, true copies of which are attached hereto as pages numbered 4, 5 and 6 in support of this Complaint.

51.   Defendants' confirmation package attached hereto adequately proves that Defendants and their telemarketers knowingly use false and misleading representations that may, tend to or do deceive or mislead because the document states requirements for the transaction that were not disclosed by the telemarketers prior to payment by Plaintiff.

52.   As the Court can see for itself, the Terms and Conditions on the letter states additional money of "$300 will be charged to the credit card on file" if guests

        a)     do not attend a "required sales presentation"   OR

        b)     do not  "speak ENGLISH".

53.   Defendants own and control the website www.spinnakerresorts.com, its content and how it is used.

54.   The website www.spinnakerresorts.com  is actively used to directly communicate with individual robocalled consumers such as Plaintiff, and to transmit individualized computer files to robocalled consumers about their purchases, such as the communication attached hereto.

55.   The attached confirmation package represents that the "sponsor" of the transaction made with Plaintiff is "Resort Sales Inc."

56.    "Resort Sales Inc." is either the fake name of a non-existent entity or it is a trade, assumed or alias name of Spinnaker.   Alternatively, Resort Sales Inc. is the alter-ego of Spinnaker.

57.    The telemarketing calls to Plaintiff described above were made on behalf of Defendants as Sellers or sponsors of the calls to encourage the purchase of or investment in Defendants' time-share properties.

58.    Plaintiff never gave prior express written consent to receive telephone solicitations from Defendants and has never had any prior relationship with Defendants.

59.    Defendants' calls complained of herein aggravated and harrassed Plaintiff, wasted his time, invaded his privacy, disrupted his days, were an obnoxious nuisance, and cost him electricity to re-charge his phone.

60.    Defendants all formulated, directed, controlled and participated in the unlawful telemarketing practices the subject of this Complaint, including by their development, review and approval of the standardized false, misleading and deceptive scripted telephone sales pitches.

61.    Defendants' conduct set forth herein and directed at Plaintiff in New Mexico was knowing and willful.

62.    Defendants' conduct set forth herein and directed at Plaintiff in New Mexico was intentional, conscious, deliberate and volitional.

63.    Plaintiff's cell phone number referred to above that Defendants or their co-conspirators repeatedly called, has at all relevant times been continuously listed on the National Do-Not-Call Registry ("the Registry").

64.    All the telephone solicitations to Plaintiff described above occurred within a single 12-month period.

**Defendants' Direct or Vicarious Liability**

65. For 25 years now the FCC has made clear that "the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 F.C.C. Rcd. 12391, 12397 ¶ 13 (1995). *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574 (2013). Both actual and apparent authority, and ratification, can be a basis for a finding of vicarious liability. *Mohon v. Agentra LLC*, 400 F.Supp.3d 1189, 1226 (D. NM 2019). The FCC has rejected a narrow view of liability, including the assertion that liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.*

66. "[A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were ***judgment proof, unidentifiable, or located outside the United States, as is often the case*** . . . . . . As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy." May 2013 FCC Ruling, 28 FCC Rcd at 6588 (¶ 37) (internal citations omitted).

67. A direct connection exists between all Defendants herein and the calls complained of by Plaintiff because the calls were directly made on behalf of Defendants so they could all profit from a common enterprise in which they all substantially participated.

68. Defendants are vicariously liable for the calls complained of by Plaintiff herein because they:

a) authorized Jane Does to initiate the phone calls or initiated the calls themselves;

b)      directly or indirectly controlled the persons who actually made or initiated the calls;

c)      allowed the telemarketers access to information and operating systems within Defendants' control for the purpose of selling goods and services, without which they would not be able to sell their insurance using robocalling;

d)      allowed the telemarketers to enter or provide consumer information into Defendants' sales or operational systems;

e)      approved, wrote, reviewed or participated in developing the telemarketing sales scripts;

f)      Defendants reasonably should have known or consciously avoided knowing that the actual telemarketers were violating the law and Defendants failed to take effective steps within their power to require compliance;  OR

g)      Defendants gave substantial assistance or support to Jane Does and each other while knowing, consciously avoiding knowing, or being recklessly indifferent to the fact that Jane Does were engaged in acts or practices that violated the TCPA, the UPA and/or  TSR.

69.      Defendants' co-conspirators the Jane Does apparently had authority to engage in the autodialing and robocalling at issue because after Plaintiff patiently listened to the scripted sales pitch and participated in the transaction they sought, he received the attached confirmation package from Defendants as Sellers and sponsors of the calls.

70.      Defendants ratified the robocalls to Plaintiff described above because they accepted and intended the benefits to them of the calls while knowing or consciously avoiding knowing their telemarketer-agents were robocalling cell phones and phone numbers listed on the Registry without complying with the Registry.

FIRST SET OF CLAIMS FOR RELIEF - UPA Violations

71. Plaintiff hereby brings this action pursuant to the New Mexico Unfair Practices Act ("the UPA") to recover his statutory damages for each violation of the UPA and his attorney fees. As set forth above Defendants' conduct was knowing and/or willful therefore Plaintiff is entitled to and should be awarded treble his statutory damages.

72. The calls to Plaintiff described above violated NMSA §57-12-22(A)(1), §57-12-22(B)(1), §57-12-22(B)(4), §57-12-22(C)(1) and §57-12-22(C)(2). Plaintiff should be awarded $300 for each separate and distinct violation of the statute.

73. Each call to Plaintiff from Defendants the subject of this matter was also an actionable unfair or deceptive trade practice because each call violated § 310.4 of the Telemarketing Sales Rule.

74. Defendants additionally distinctly violated the UPA because pursuant to 16 C.F.R. §310.3(b):

> "It is a deceptive telemarketing act or practice and a violation of this Rule for a person to provide substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violates §§310.3(a), (c) or (d), or §310.4 of this Rule."

75. By using spoofed local area code phone numbers at which the caller or Defendants cannot be called back, to trick Plaintiff or others into answering illegal robocalls because they might think the caller was actually a local caller, Defendants caused confusion or misunderstanding as to the source of goods or services and Defendants used deceptive representations or designations of geographic origin in connection with goods or services. Plaintiff also hereby sues for injunctive

relief against this practice. The type of intentional Caller ID spoofing used by Defendants as described above is a crime because it was knowingly done with intent to wrongfully obtain a sales lead. 47 U.S.C. § 227(e)(1); 47 U.S.C. § 227(e)(5)B

76. When Defendants sold Plaintiff their confirmation package for $100, Defendants knowingly:

represented that goods or services had sponsorship, characteristics, uses, benefits or quantities that they do not have or that a person has a sponsorship, affiliation or connection that the person does not have;

represented that goods or services are of a particular standard, quality or grade when they are of another;

used exaggeration, innuendo or ambiguity as to a material fact or failed to state a material fact when doing so deceives or tends to deceive; and

failed to deliver the quality or quantity of goods or services contracted for.

77. Because Defendants or their agents failed and refused to properly identify themselves and/or the Sellers or sponsors of the calls as required by the UPA, the TCPA and the TSR, during the calls themselves, they caused Plaintiff actual damages consisting of loss of time and money for Plaintiff to identify Defendants himself, contrary to Defendants' scheme. Plaintiff's loss of money is recoverable pursuant to the UPA.

<u>SECOND SET OF CLAIMS FOR RELIEF - Violations of the TCPA's Subsection B</u>

78. The foregoing acts and omissions of Defendants or their agents on their behalf violated 47 U.S.C. § 227(b) and its implementing regulations.

79. Plaintiff is entitled to and should be awarded against Defendants $500 in damages for each and every violation of the TCPA's Subsection B and its implementing regulations. Because Defendants' conduct set forth above was knowing and/or willful Plaintiff is entitled to and should be awarded treble damages of up to $1,500 for each and every violation.

THIRD SET OF CLAIMS FOR RELIEF - Violations of the TCPA's Subsection C

80. Defendants or Defendants' agents on Defendants' behalf made telephone solicitations to Plaintiff more than once within 12 months despite the fact his phone number Defendants or their agents called has been continuously listed on the Registry at all relevant times.

81. For each of Defendants' calls to Plaintiff the subject of this Complaint, Plaintiff should recover up to an additional $1500 pursuant to 47 U.S.C. § 227(C).

COMMON-LAW CLAIMS

82. Plaintiff hereby sues Defendants for trespass to chattels and for their civil conspiracy to direct an illegal telemarketing campaign into the State of New Mexico and to Plaintiff in particular.

83. As set forth and described above, Defendants' conduct was knowing, willful, wanton, reckless and/or intentional with conscious or deliberate disregard of Plaintiff's right to not be subjected to Defendants' illegal harassment.

84. Plaintiff should have and recover judgment against Defendants for all his actual damages or all his statutory damages, and for an amount of nominal plus exemplary damages sufficient to set an example and deter in the future the conduct complained of by Defendants or others.

85. Telemarketing campaigns generally place calls to hundreds or thousands of potential customers *en masse*. The Court should allow discovery regarding Defendants' net worth and the scope of Defendants' telemarketing as described above into the State of New Mexico, in order to set an appropriate amount of exemplary or deterrent damages considering the extent of unlawful harassment by Defendants and their ability to pay.

WHEREFORE, Plaintiff prays for entry of judgment for - his statutory, actual and/or treble damages sufficient in size to set an example and deter in the future the conduct complained of by Defendants or others. Plaintiff prays for appropriate exemplary or deterrent damages and for such other and further relief as the court finds proper. Plaintiff requests an award of his attorney fees and costs.

RESPECTFULLY SUBMITTED,

By: ______________________

Sid Childress, Lawyer
1925 Aspen Dr. #600A
Santa Fe, NM 87505
childresslaw@hotmail.com
(505) 433 - 9823
Attorney for Plaintiff

EXHIBIT A

**ANSA ASSUNCAO, LLP**
(A Pennsylvania Limited Liability Partnership)
Two Tower Center Blvd., Suite 1600
East Brunswick, New Jersey 08816-1100
(732) 993-9850
Attorneys for Defendant Spinnaker Resorts, Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HENNA CARDENAS, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SPINNAKER RESORTS, INC., a Florida Corporation,<br><br>Defendant. | Civil Action No.: 2:16-cv-02466 (JLL) (JAD)<br><br>**DECLARATION OF BASIL W. MATTHEWS IN SUPPORT OF SPINNAKER RESORTS, INC.'S MOTION TO DISMISS THE COMPLAINT FOR LACK OF PERSONAL JURISDICTION** |

I, Basil W. Matthews, declare under penalty of perjury, the following:

1. I am employed by Southwind Management Corp., 35 DeAllyon Avenue, Hilton Head, South Carolina, as Comptroller.

2. I have been employed by Southwind Management Corp. since 2000.

3. As part of my employment duties, I act as Comptroller for Spinnaker Resorts, Inc. ("Spinnaker"), the defendant named in the above-captioned case.

4. I have personal knowledge of the facts presented herein. I make the following statements with respect to the time frames alleged in the plaintiff's Complaint.

5. I have reviewed the Complaint in this action, which alleges that the plaintiff, Henna Cardenas, is a New Jersey resident who claims to have received telemarketing calls on her residential telephone line purportedly made by or on behalf of "Spinnaker Resorts."

EXHIBIT A

6. Spinnaker is a corporation organized and existing under the laws of the state of Florida. Spinnaker's principal place of business is 35 DeAllyon Road, Hilton Head Island, South Carolina 29928.

7. Spinnaker is a real estate company that owns and sells time share property interests, engaging the services of wholly-owned subsidiaries to support the sale of those property interests.

8. All telemarketing activities directed to potential customers are conducted by Spinnaker's subsidiary corporations, Resorts Sales Missouri, Inc., a Missouri corporation, or Resort Sales by Spinnaker, Inc., a South Carolina corporation, or independent telemarketing companies they hire.

9. Spinnaker does not have any employees.

10. Spinnaker does not conduct telemarketing activities or make telephone calls to solicit sales from potential customers.

11. Spinnaker does not hire or contract with independent third party marketing vendors to conduct telemarketing activities.

12. Spinnaker owns no property in New Jersey. It does not maintain an office in New Jersey. Spinnaker does not have a telephone number or a telephone directory listing in New Jersey.

13. Spinnaker does not transact business in New Jersey. It does not pay taxes in or to New Jersey or any New Jersey political subdivision.

14. Spinnaker does not maintain a bank account in New Jersey.

15. Spinnaker is not licensed to do business in New Jersey.

16. Spinnaker does not have a registered agent in New Jersey.

2

17. Spinnaker does not advertise in New Jersey.

18. Spinnaker does not sponsor, conduct or participate in any sales promotion event, trade show, or conference in New Jersey.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on July 8, 2016.

Basil W. Matthews

From: <donotreply@spinnakerresorts.com>
Date: Fri, Aug 7, 2020, 2:36 PM
Subject: Your Spinnaker Marketing Vacation Confirmation
To: <mitchell6855@gmail.com>

Please see your confirmation letter attached.

4



August 10, 2020

Mary Miceli
Michell Miceli
1275 Jean Place SE
Rio Rancho, NM 87124

Confirmation Number: HH 971950

Dear Mary Miceli,

We are excited for the opportunity to introduce you to the Spinnaker Resorts way to experience exceptional vacations! We are happy to inform you that we have your vacation package on 'open' status for Hilton Head Island, South Carolina. To set your dates please call us at the below toll free number and a vacation specialist will help assist you with your request. Please review the following reservation information carefully.

| Hotel Package | |
|---|---|
| Standard Room | |
| Arrival Date | Nights |
| Please provide 60 days advance notice when scheduling your vacation. | 3 |
| Package Price | $ |

| Premiums | Qty |
|---|---|
| $25 Dining Dough | 4 |

Reader's Choice Magazine voted Hilton Head Island the 9th Best Island in the World and this natural island paradise is closer than you think. During your stay you and your family can enjoy dining, spa treatments, golf, tennis packages, the beach, bike rentals, swimming, cycling and so much more! Spinnaker Resorts has been a special part of the island since 1984 providing families with affordable incredible vacation ownership opportunities enhancing your family's health and lifestyle. Our commitment while you are on your resort preview is to show you the benefits of vacation ownership in a fun, upbeat, and professional manner.

If you have any questions, please contact one of our Customer Service Specialists at (877) 301-7829. When you are ready to inquire about travel date availability please visit us at http://getaways.spinnakerresorts.com. Please read the Details of Participation and Eligibility Requirements included with this letter to ensure you are aware of all requirements to be eligible for this discounted vacation.

We are very excited to have the opportunity to show you and your family the Spinnaker Resorts way of vacationing. Spinnaker is at your service to ensure that you will encounter only smooth sailing and have the most memorable vacation possible. For any questions or to confirm your stay please call (877) 301-7829 and ask for reservations.

5

EXHIBIT A

**Terms and Conditions**

We are at your service Monday – Friday from 9:00 a.m. to 7:00 p.m. and Saturday from 9:00 a.m. to 2:00 p.m. Eastern Standard time to answer questions and/or confirm reservations. We can be reached during the aforementioned hours by calling (877) 301-7829. This offer is made on a space available basis and is sponsored by Resort Sales, Inc. as part of an advertising plan for vacation ownership. Holidays and peak travel dates may be limited. Transportation, incidentals, taxes and meals are not included. Check-in time at the Visitors Center is from 10:00 a.m. to 6:00 p.m. located at 3 Office Way, Hilton Head Island, SC, 29928. If you will be arriving after 6:00 p.m. it is essential that you call the Visitors Center at (866) 248-2943 to confirm your late arrival and guarantee your accommodations. No specific room or view is represented in this offer. Check-in time at your hotel is 4:00 p.m. and check-out time is 10:00 a.m. A credit card is required for security deposit at check-in. Maximum occupancy per hotel room is four (4). No pets are allowed. Campers, trailers and motor homes are prohibited. We know plans change; sometimes an emergency arises and other times you just end up needing a more convenient date than the one you originally chose. That's why Spinnaker Resorts offers a flexible rescheduling policy. As long as you call us at least 7 days before your arrival date, we can reschedule your vacation for $75 - $150 based upon requested dates and availability. If you have already purchased Spinnaker's Travel Protection Plan, you have been allotted 1 reschedule with use up until 7 days prior to arrival and cancellation fees will NOT apply. Please note that if you don't give us at least 7 days' notice, or haven't purchased Trip Protection, our cancellation policy will apply. Spinnaker Resorts also understands that on occasion you can't reschedule your trip and must cancel instead. In the event of cancellation, a $150 fee will be charged. If you cancel you reservation less than 7 days before your arrival date you will be assessed a $150 cancellation fee plus 1 room night (at the additional night room rate). Due to the promotional discounts of this offer, refunds are not available. If you no longer qualify for the preview or can no longer travel, this package is fully transferable to another qualified guest. Please note that if you do not attend the full sales presentation or do not qualify under the terms of this agreement, a fee of $300 will be charged to the credit card on file. Any premiums offered will only be honored upon completion of the presentation, provided the participant has complied with the terms of the offer. This offer cannot be used in conjunction with any other Spinnaker Resorts offers. If you are a current Spinnaker Owner it cannot be used in conjunction with your ownership week. The resort reserves the right to alter, substitute or amend any offer at any time for equivalent accommodations and/or premiums. This package is not redeemable for cash and is void where prohibited by law. All Federal, State and Local laws apply. The vacation package is transferable with written approval of Resort Sales, Inc. The retail value of this package depends on the room type, the time of year of travel and premiums received. Due to the promotional discounts of this offer, refunds are not available. During the required sales presentation, guests will be offered the purchase of a vacation ownership interest by a representative of one of the Spinnaker companies including Resort Sales by Spinnaker, Inc., Resort Sales Missouri, Inc., Resort Sales Florida, Inc., or Spinnaker Resorts, Inc. All guest's names appearing on this confirmation letter are required to attend a 90 – 120 minute VIP sales presentation of a Spinnaker Resorts Property. For identification purposes, a valid driver's license and major credit card must be presented upon hotel check-in and VIP preview registration. You may only tour this resort once within a twelve (12) month period. To ensure customer satisfaction, contact our reservations department to book your travel dates at least 60 days before you requested arrival date (at least 90 – 120 days' notice when requesting travel dates during peak season such as spring break and major holidays). Should a customer wish to travel within 60 days of purchase, please contact reservations; as reservations within 60 days are based on space availability due to the high demand of the destination. Purchasers of this getaway will not be eligible to request a condo reservation for travel to our Hilton Head or Ormond Beach locations during the April 1st through August 31st timeframe. This promotion is designed for couples between the ages of 28 and 75, with a combined annual income of at least $55,000. Retired couples must share a yearly income of no less than $45,000. All couples must have matching state issued identification showing proof of cohabitation. Single females must have an annual income of no less than $60,000. (NOT APPLICABLE IF YOU OWN WITH SPINNAKER RESORTS.) If married, cohabiting or engaged both parties must attend the 90 – 120 minute sales presentation together. All attendees of the sales presentation must be either U.S. or Canadian citizens and able to speak English; unfortunately translators are not available. This offer is not valid for group travel. Group travel is considered more than one party traveling to the same destination with the same itinerary.

6

**EXHIBIT A**